Page number 18-1325. ESR, Inc. petitioner v. supervisor v. EPA petitioner v. EPA petitioner v. EPA petitioner v. EPA petitioner v. EPA petitioner v. EPA Good morning, your honors. May it please the court, my name is Kate Stetson. I represent the petitioner Meritor. I'd like to begin, if I may, with the standing questions this court posed in its Monday order. The court asked two questions. The first is, is Meritor a potentially responsible party under CERCLA, and if not, what are the legal and factual basis for standing? The answer to question one is yes, and the most expedient way to see this is in a document that we cited at page 15 of our brief and pages 11 and 12 of our reply. This is the administrative settlement that EPA and Meritor entered into that requires Meritor to continue to run the sub-SLAM depressurization system, which I'd like to call SSDS if I can. And that settlement at page 7 of the document contains a conclusion of law, paragraph 29b. And that conclusion of law is that EPA has determined that respondent, and respondent is Meritor, under the caption of this settlement, is a responsible party under section 107A of CERCLA, 42 U.S.C. 9607A. I'm going to page one of that same document as Meritor strongly disagreeing, or strongly reserving the right to dispute that. So I'm just trying to make sure I understand. So is there, is your position they're standing because you now agree that you are, that Meritor is a responsible party, or there's a substantial enough risk when that's EPA's conclusion? Well, I think it's, since EPA did make that determination of law, it may have been a determination with which we disagreed at the time. It was in a settlement, right? Yeah. I'm just saying, I'm just, what you all said in that same, what your client said in that same settlement is you don't admit and you retain the right to convert, controversy, excuse me, the findings and conclusions of law made by EPA. Yes, but first of all, the conclusion was made. And second, as we also explained in our brief, there are multiple bases for finding Meritor has standing. This is something you can also find shot through the joint appendix. The EPA repeatedly refers to Meritor as a corporation that took on the liabilities of Rockwell. And this site, of course, is the Rockwell site. So there are a host of reasons, many of them we articulated in our brief. The PRP we did not, and for that I apologize. But EPA has determined that we are a potentially responsible party and we are here because we stand to suffer a significant amount of, you know, both financial and reputational and other harm that stems from this particular listing. Just to make sure I understand your position, because you are or because there's a substantial risk given they said you are a potentially responsible party, that's two different terms. If I remember correctly, I think this court in Mead court versus Browner found standing even when a party was a potential, potentially responsible party. I think the court made a similar reference in the CPS case, actually. So for these purposes, even, I don't think we need to concede that we are a PRP. It is enough that EPA has found us to be one and that we stand to suffer the kinds of harms that we articulated in our brief that stem from this listing. The harms articulated in your brief were that you have contractual responsibilities for this land. No. The harms that we articulated in our standing section were that the possible future expansion of the site, the additional reputational harms that would flow, and importantly, under Mead and CPS, the increased leverage that EPA has to exercise over a company like Meritor once the site goes on the list. All of those things are what the court found in CPS were sufficient, what the court found in Mead were sufficient. In fact, what the court found in Mead were ample, despite that particular petitioner's being a potential, potentially responsible party. So I would submit there's really no question. Okay. If you see anything that says you have certain environmental obligations on page 21, so that's... Yes. And on the next page, I think we refer to... What are string sites of parentheticals? And those parentheticals, Your Honor, are designed to encompass the reasons why we have standing in this case. If there are further questions on standing, I'm happy to answer them, but I'd like to proceed to the merits, if I may. And I want to start with where the final support document supporting the listing here. Because what EPA calls CERCLA, the purpose of CERCLA, is to assess the uncontrolled hazardous waste sites that EPA has concluded pose the greatest relative risk across the country. But by the time EPA even proposed listing this site in January of 2018, Meritor had installed an SSDS that had substantially abated the exact vapors that we are talking about here. And I want to mention that this is the first EPA listing to be listed solely on the new subsurface intrusion pathway. So you started with a reference to the statute itself. Can I just ask the nature of your claims? You say EPA's decision, listing decision, is arbitrary and capricious. Is that solely because the listing decision is inconsistent with the agency regulation? Or do you have a further position that even if they've followed the regulation, the regulation is unlawful as applied and therefore the listing decision is arbitrary and capricious? It is largely the former of the regulation. And the reason why I say largely the former is that there is the directive in the amendments to CERCLA, the SARA amendments, that requires EPA to modify the HRS tests to the greatest extent possible and try to assess relative risk. And that I think plays a role in some of our arguments, but the regulations are really where we locate our arguments. So with respect to the SSDS, the argument that we made to EPA after it proposed listing the site after the SSDS was back and running on EPA's order, I should add, was that EPA could not disregard this system when it was testing the extent of vapor intrusion into a structure. Vapors intrude because something lets them intrude. And if something in the government's words discourages those vapors from intruding, that  I may be taking more time than I ought to on this, but it seems there's a basic different understanding between the petitioner and the agency on the consequences of scoring high enough on the listing test to begin with to be listed. The agency's position is that, if I understand you correctly, is that once you're on that list, the obligation and purpose of being listed is to clean up the site. The petitioner's position seems to be that the obligation is to make enough changes to get the score down to where it no longer qualifies. Am I correctly stating the difference of opinion as you see it? No, I don't think that's correct, Judge Santel. I think maybe the best way to look at this is just to think about the timing of these actions. As I mentioned, when EPA proposed this listing, there was already the subslab system in place and running at EPA's order. So, if this wasn't a case, you can imagine a hypothetical case where EPA proposes a listing and the day the comment period closes or after the comment period closes, the PRP comes in and says, we fixed it, we fixed it. That's not this case. What this case is, is EPA knowing that there was a system in place that was specifically designed, in fact, state-of-the-art designed, to make a... It's not about the listing. When they did the scoring, not with the listing at the base, the system was not in place. I see. No, maybe I haven't been as clear with my language as I should. When it proposed the listing, in the proposed rule, it did the preliminary scoring. That was the point at which Meritor said, your preliminary score was based on old data. That's what I'm talking about. The old data arose... Yes. The data upon which they did the scoring... Yes. ...existed before the installation of the system. It did, indeed. Because the time they did that data gathering, the listing may not be in place, but it is the listing could kind of be in place, right? At the time they did the data gathering, it was actually even before the subsurface intrusion rule was passed. But to your point, Judge Sentelle, one of the things that the final rule says, pertaining to the subsurface intrusion component, is, and I'd like to read this, preliminary HRS scores are refined as sites progress through the process, and does not mean the site would ultimately qualify for the MPL. Now, that sentence squares exactly, of course, with this court's more general APA holdings, which are, if you know that the facts are stable or false at the time that you find them, you should update your facts. That's the case that we cite in our reply brief at 14, Missouri Public Service Commission. So you're talking about a period within about a year. So the facts weren't false, that they found were not false. I don't think it was stale to say we collected information and then six months later, there was a system there that was changing, under your view, was changing some of the ratings. Stale usually requires a lot longer time difference, right? I do understand with government time, that may not be stale, but EPA knew that the facts were stale. That's the difference. They're stale? And let me, yes, and let me also, from October 2016, in the listing that was proposed in January 2018, yes, I would say those are stale. But more importantly... We have a lot, 2017 is, I guess, when we see stale stuff from government, it's a lot longer than that. I'm sorry, but the EPA sort of has to fish your cup bait on making these complicated decisions, and they can't keep changing their data right up to the moment of listing. And so I guess I'm having trouble that they knew it was stale, that they couldn't count on it? They knew that this system was up and running even before they proposed this. And so the request that we made after this was listed in January 2018, and I see my time is running out, but I'd like to continue, was that the EPA take into account this system that was installed. And let me also locate this in the regulations themselves. So, yeah, can I just, just to me, once you answered my question the way you did, I'm in the weeds of the regulation, which is a bit painful, but... I hear you. I mean, the governing provision, we are talking, we are talking about, as I understand it, their assessment of line one on the chart, right, observed exposure. And when you go to the regulation on that specific provision, it asks whether a hazardous substance has been released into the structure. At present perfect tense, has been released in the past. This is a case where everybody agrees the hazardous material has been released. And then when you look more broadly at the regulation, it explicitly builds in your idea that you have hazardous substances in two other lines, not line one, but line, if I have it right, 2A, which is structure containment, and targets, which is 8 through 11. So if we're in the weeds of the regulation, it seems to, seems to agree with you, but only on other parts of the calculation that are not at issue. I think that is, that's not entirely correct, Judge Katsas, and I'd refer you to page 22 of the addendum of our brief, which is the section that begins the subsurface intrusion rule, 5.2.0, which is general considerations. And it states, and I'll quote, evaluate the subsurface intrusion component based on the actual or potential intrusion of hazardous substances into all regularly occupied structures that have structure containment values greater than zero. Despite the existence of this system, which under the... Sorry, what's that called? 5.2.0? 5.2.0, titled general considerations. So basically, when you start this process, you first ask, is there a structure that has a structure containment greater than zero? And table 5-12, which we cite repeatedly in our brief, shows you that the structure containment levels actually are dictated by, among other things, whether there is an active vapor mitigation system in place. So the structure containment level of this system is something that is set out from the first. And the reason, I think, Judge Katsas, it wouldn't be... I'm sorry, but greater than zero as a threshold of inquiry doesn't really help you. Because if you look at structure containment, the mitigation system just gets you down to a two, which is greater than zero. And you have an independent consideration of foundation cracks, which I think were present here, which gets you the full 10. No, I think those two considerations would be geared to two different times. The foundation cracks are what EPA identified before the system was put in place. Once the system was put in place, it's a two. But my point to Judge Katsas isn't that just because the structure containment is a two, we win. My point is that this intrusion rule requires consideration of structure containment from the outset. So it's not just with respect to targets, it's not just with respect to something else. It's from the outset. Let me also add... Before you go on, on the cracks and crevices, sorry, is there a showing in the record that your system was 100% effective and so compensated for any intrusions through cracks and crevices? My understanding is not that that was one of their concerns. Judge Millett, no vapor mitigation system is 100% effective. So there's not a showing. But that logic would suggest that even when you had, as the regulations specify, an active vapor mitigation system, that you'd always score it a 10 because it's not universally 100% effective. And that can't be right. In fact, the government hasn't contested that this is an active vapor mitigation system. But more to the point, one of the things that government relies on in its brief is the final rule from 1990, which were the amendments that were made to the HRS system after Congress told them they needed to tighten things up. And one of the things that those amendments say is when you are calculating the waste quantity, which is one of the other lines on that chart, Judge Katsas, when you are calculating the waste quantity, you take response actions into account. And that is something, in fact, I think is the easiest path to vacate or hear. Sorry, but doesn't that just bring us back to the question of what's the inference you and I had posited to you that line one was silent with this tense issue. And I didn't have 5.2.0 at my fingertips. I'll take a look at that. That's a separate argument for you. But I don't necessarily see how incorporation in other parts of the calculation help you with regard to line one. Well, with regard to line one, I think I would refer you back to that general consideration. What it means is before you embark on the subsurface intrusion test, ask yourself whether there is a containment system in place. If that containment system is greater than zero, then proceed. But that necessitates you finding whether there's a containment system in place. Once you have an observed exposure under regulation, 5.2.1.1.1, you automatically get assigned 550 points. And you don't go on to potential for exposure, which is where your structure of containment argument, where they do explicitly reference the systems, kicks in. But they don't go any further to look at that. So you're just relying on this general background statement. No. In fact, I'm not. I'm not only relying on the general background statement, which isn't just a background statement. It says this is how you start your inquiry. You start your inquiry by looking at whether there's a structure of containment system in place. Do you get 550 for the observed exposure? Maybe I'm misunderstanding. You don't dispute the assignment on the table of the 550? Oh, no. We do dispute that. We do dispute observed exposure. That's one of the three errors we think that EPA made, because it didn't assess that exposure at the time that it should have. At the time that it proposed listing this site, it knew that there was a sub-slab system in place that was mitigating these hazardous fate risks. And it also found exposures after the system was in place. I'm sorry? It also found exposures after the system was in place. It did indeed. And I would encourage the court to look very closely at that, because what the government is saying in its brief is the observed exposure after the system was in place was in relation to a single test at a single site at a particular location on the property. And I'd like to suggest that you compare that to the actual approach that EPA took in January 2016 and January 2017, when it took six sites, multiple samples, and chose the highest of each potentially hazardous element, and chose the highest of those to form the background. I just want to get back to, you have made an argument in brief that's very textual, that they're ignoring, that the text commands them and the regulation commands them to factor this in, that the text of the observed exposure is not potential for exposure. And anyhow, there was an observed exposure even after the system was in place. Now, maybe you're switching to an arbitrary and capricious argument as to how they identified or calculated that actual exposure. But as to the fact that there's 550 points for observed exposures before and after, I guess I'm not sure how the fact that you have a mitigation system helps you. Okay, the fact that there is a mitigation system actually is shot through the regulations. So starting with 5.2... No, it's selectively in the regulation. It's not shot through. Starting with 5.2.0, it asks you before you embark on this, does it have a structure containment system? The answer to that is yes. You take the structure containment system into account. So the fact that the observed exposure doesn't say, P.S., is there a structure containment system, is rather beside the point. The point is when EPA proposed this for listing, it knew there was a structure containment system. But let me make this as straightforward as possible, because I think there are several different bases that we've articulated for why EPA's listing should be vacated. We think the most straightforward one is the waste characteristics issue that I mentioned. And the reason we think it's most straightforward... I'm sorry, which one? The waste characteristics. Can we just finish up with likelihood of exposure? Certainly. I'm sorry, this is pretty complicated stuff. No, it's... Let me ask you an intuitive question, which is... It seems very different if a party actually cleans up... Say there's hazardous gas in a room, and option one is you get rid of the hazardous gas and solve the problem that way. Option two is you solve the problem by turning on a fan. Gas is still there, and you just fan it out. Why is it unreasonable for EPA to say, well, we'll take into account and give you credit if you get rid of the hazardous substance, but if you're just turning on the fan, well, we're not going to give you credit. The fan can turn off, the fan can break. We're going to be cautious and not... Analyze it without the fan rather than with. Right. I think the first answer is that the regulations instruct EPA to consider this, but I want to make a point about the fan. If you look at Joint Appendix 373 to 374, which are the summary of the pilot test that was run on this, you will find a very detailed description of this subslab system, how it was installed, what it involved, the 68-foot stack that came along with it. This is not a fan under a crawlspace. This is actually a system that is state-of-the-art that was put in place in order to mitigate the intrusion of vapors into the structure. And when I put it this way, it should be self-evident that when something mitigates the intrusion of vapors into the structure, it mitigates subsurface intrusion. But to the waste characteristics point that I wanted to mention, because I think this is the most straightforward... Still, I don't know if it's mechanical or electrical or what, but it does have an on-off switch, right? It does have an on-off switch, but if you look at the structure containment values, one of the distinctions that the values make, it gets less and less contained as you go up. One of them is a passive mitigation system. So maybe that's you open the windows. Maybe that's you put in an electric fan. This is a system that EPA has required Meritor to keep running continuously, in fact, has been running continuously. So for purposes of assessing... Do you disagree? It seems to me it's more like the fan than like the case where they just eliminate the gas. Am I thinking about it the wrong way? I think it's actually both. I think that the reason that it mitigates the vapors is because it creates a pressure system under this building that prevents the vapors from entering. But the other thing that it does, and this pertains to the removal of the waste, is that it processes those vapors through a number of carbon treatment facilities out through the stack, 99% clean. So this is both a remediation and a removal. It doesn't stop the creation of vapors over the course of years. There will still be vapors coming off of the hazardous waste. And I think that's why EPA required Meritor to keep this system running until EPA tells it otherwise. But for purposes of... It would never, at least not within human lifetimes, it would never take away the hazardous waste that are producing the vapors. It is simply managing the vapors. I don't think that's entirely correct. I don't think they do. But for the reason that I mentioned to Judge Cassis, this is also treating the elements that are giving rise to the vapors. But for purposes of the subsurface intrusion system, this is one of the fallacies that I think is in the government's brief, the idea that the subsurface intrusion pathway, something that involves do vapors come up into a structure, that that can only be mitigated by something that completely removes the waste from the site. That is simply nowhere in the regulations. And, in fact, all of these references to the structure containment systems, which go all the way back to 1990 structure containment systems that are mentioned in that particular rule accompanying the amendments, structure containment systems matter for purposes of scoring. And I mentioned the 1990 rule for a reason. Because even the government can see this. The 1990 rule, which is the rule that tightened up the HRS, talks about when you should determine or when you should take into account a response action like this. And what it says is you should take into account response actions in determining waste quantity. So even if you hold observed exposure constant, even if you hold targets constant. I'm sorry, I just got it. Sorry. In determining waste quantity, which is item six. I believe that's right. Not item one. No, but that's the point that I just made. Even if you hold observed exposure constant, we'll give EPA the five cents. This is your separate argument about waste quantity. Yes, exactly. I'm sorry, I thought you were invoking that. Are you invoking that as further support for your observed exposure argument? Well, I think it certainly serves as further support for the argument that even in 1990, EPA was recognizing that response actions have a purpose. And what you saw in these 2017, this new rule, is that the response actions are actually baked into the scoring for this rule. So that's the difference, I think, between what EPA was saying in 1990 versus now. So the point that I was making, and I think the point where EPA has to grudgingly agree, is at the very least, you take this response action into account when you are calculating that separate question of waste characteristics. And the point we make in our brief is even if you hold observed exposure at the 550, even if you hold the targets as if we're talking about residents rather than workers, which itself is a logical fallacy, then you get to that waste characteristics question in the middle. And what the waste characteristics question asks you is, can you estimate with reasonable confidence the mass of hazardous substances in this structure? And if you can, then you perform what's called a Tier A calculus. It is only if you cannot estimate with reasonable confidence the mass of constituents in the structure that you drop down to Tier B or Tier C or Tier D, which is where EPA ended up when it proposed this listing. And by dropping down to Tier D, I just want to make a point about the quantity here before I talk about Tier A. The consequence of EPA using Tier D to calculate the waste quantity was that it calculated the equivalent of 10,000 pounds of hazardous substances in this building because it was just going on the footprint of the building. Our point, and we preserved this at Joint Appendix 48, is that EPA should have taken the SSDS into account when calculating the waste quantity. And the reason that we think that point is important is, once the SSDS was up and running, the variability in the hazardous substances that were being detected shrank to a very narrow range. One of the reasons that EPA said in its support document that it couldn't calculate Tier A was because there was simply no way of estimating with reasonable confidence how much substance was in the building. Our point is... Can you tell me where you made this argument that you have to apply Tier 1 because we have this system? Where you did preserve that below? At Joint Appendix 48. Okay. What's the executive summary? Where is that? Where in there? Sorry, I might be able to just start. I'll send it to you. You make general complaints about them not paying attention to the fact that you have a... Where's the Tier 1 argument? We don't make the Tier 1 argument. What we say is that the sub-slab depressurization system was required to be taken into account. In deciding which tier? In deciding which tier. Yeah. I'm sorry. J48, right? EPA was required to consider an active vapor mitigation system when calculating the hazardous waste property. So that doesn't say as between which tier. Where did you argue for Tier 1 below? Where did you tell the agency it should be in Tier 1? What we argued was that the SSDS needed to be taken into account, Judge Millett. Because the SSDS needed to be taken into account, one of the governing considerations of all of these tiers is if you can calculate it at Tier A, you do not drop to a lower tier. End of discussion. So EPA, of course, is regulated by that. But they said they didn't do Tier A for some very specific reasons about variation in the concentration and airflow. Yeah. And I guess I just haven't seen where you were arguing that that's really not whether there's a system there or not. Those are just distinct concerns about why they couldn't do Tier A, and that's where I wasn't seeing your argument as to why they could do Tier A. Right. So the EPA's discussion about the differentiation and concentrations goes to my point about the importance of the SSDS. I'm thinking where you preserved this. That is where we preserved it. You can also look at Joint Offenders 53 to 54, which I think we also talked about the SSDS as being an important element of each of these calculations. But let me also say, this is not something that was discretionary with EPA. So they were on notice that you had to be in Tier 1, Tier A? Tier A, sorry. Tier 1. What we argued was that the SSDS needed to be taken into account. And as I mentioned... In the HRS scoring. Yes. That's pretty general. That's why Joint Offenders 48 makes the specific comment about waste quantity. The point with EPA taking it into account, though, is not something that was a mystery to EPA. That has been the requirement since 1990 when the HRS amendments were passed. So the fact that EPA declined to take the SSDS into account resulted in an estimate, as I said, of 10,000 pounds of hazardous substance in a structure. And even EPA concludes that that is not an appropriate estimate. Once you take the SSDS into account, EPA has then required Judge Millett to stop at Tier A. Because the band of results, essentially, from the hazardous waste test shrinks to a very narrow level. And even if you take the top score as to TCE, which is the element at issue here, even if you take the top score and you plug it into the equation, what you get is .006 pounds of hazardous substance as compared to EPA's estimation of 10,000 pounds of the hazardous substance. And once you plug that .006 into all of the necessary algorithms and calculations, what you come up with is a waste quantity factor of 6 and not 56. Sorry, just once more. I'm just trying to find it. Where on JA48 is this argument made specifically with regard to waste quantity? This just seems like a general assertion that they should have considered SSDS. In our brief, when we're talking about whether this issue was waived, this is the page that we cited. And I believe we cited it because even if it's not in the text, I think there is a footnote, and my colleague is looking for it, that specifically says, footnote 7, thank you, requiring EPA to consider an act of mitigation. Footnote 7 of Joint Appendix 48, requiring EPA to consider an active vapor mitigation system where assigning the structure containment factor and when calculating the hazardous waste quantity. But what you're citing there is an EPA requirement that addresses whether a building should be evaluated at all, not tier 1. That's not correct, Judge Melissa. What that says is that the hazardous waste quantity needs to be taken into account. The parenthetical is very vague, and my understanding of that provision is that it's whether a building should be included at all, and that's why your next sentence says to include all regularly occupied structures. Right, so it's just about which structures are in or out. It's not about tier A. No, I don't think that's correct. I mean, if you look at the text that drops down to footnote 7, the text is required EPA to consider the SSDS in scoring. And, you know, I would submit, too, that requiring a regulated party to remind EPA of its obligation to take a mitigation system into account when calculating hazardous waste quantity. Well, the city has made particular arguments, and they made very specific arguments about why this wasn't tier A, and I just don't see that being contested. And this is awfully delphic for raising a specific claim when they're talking about air flow and variation in concentrations. No, first of all, I think, Judge Millett, EPA knew exactly what we were arguing, because if you look at Joint Appendix 643 and 646 to 647, it articulates two different arguments. Sorry, which document is that? 643. Is that the support document? That's the support document, the final rule support document. Tell me your favorite 646, you said? 643. And then, again, it's 646 to 647. And I identify these because EPA notes that there are two different arguments about hazardous waste quantity. One of them is an argument that one of Meritor's experts raised about the footprint, that goes to tier D. But the expert said, you know, this is not considered to be an all-encompassing objection, this is just a footprint. The other issue that Meritor raised that EPA identified was, you should have taken the SSDS into account. And my point is, that SSDS into account, EPA, having had this requirement and operated under this requirement for three decades, should have understood that taking the SSDS into account means that it needed to calculate that hazardous waste quantity differently. And we talk in our brief about the magnitude of EPA's error, and I repeated those numbers here. 10,000 pounds versus .006 pounds. And if you take just that consideration and say EPA should have, at the very least, taken the SSDS into account when calculating that quantity, and you hold those other things constant. We haven't talked about residents versus workers. We have talked about observed exposure. We can't figure out the area or the volume, which is what they said here. How does the existence of the detection system change that? One of the things EPA says is we can't figure out the area because we don't know the height. The height was actually in the record. It did know the height. It just didn't look. We can't do this because we don't know. We can't get airflow because the concentrations vary over that. And that's very important for tier B. That's not important for tier A because even EPA's technical support document says when you look at tier A, you take a day's worth of sample. And that's what we're talking about. What does this have to do with the system being in place? I mean, if you want to just have a dispute with them about whether they could have calculated volume if they had the height, I'm having trouble understanding how that relates to the argument they should have taken the system into account. The primary argument for why EPA said it was going to calculate tier D was because it couldn't estimate with reasonable confidence the substances that were in the building. And our point is both under the 1990 regulations and under the subsurface intrusion regulation, the EPA should have taken the SSDS into account. Now, those other considerations that you just mentioned, Judge Millett, the airflow, the volume, those are all solvable problems. The volume is solvable because it knew the height. The airflow is solvable because you don't need airflow to calculate tier A. You only need it to calculate tier B. And I know that this is a complicated tiered system, but what EPA should have done is simply taken the amount of substances, which it could reasonably estimate with reasonable confidence because of the SSDS, and done the calculation by the area of the building. That's all that it needed to do. That's the point that we make in our brief. And once EPA does that, the hazard ranking score drops down to 14. So that's why I'm saying that this is the most expedient and most straightforward way to think about this. I know that it's complicated regulatorily, but it is, in fact, logically straightforward. You take a mitigation system into account when you're looking at mitigation. And EPA has been told over and over again, you take a mitigation system into account when you calculate waste characteristics, when you calculate the waste quantity. So this is an argument here that you should be in tier A or that they miscomputed tier B? That we should be in tier A. And they seem to understand that we miscomputed tier B. No, that was the point that I made about one of our experts contesting tier D. But our separate argument was that with the SSDS running, you can calculate. What tier A requires is the mass of constituents found in the structure where the observed exposure has been identified. So, again, we're holding observed exposure confident. We have a separate argument on that. It's concentration times the volume of the building. The volume of the building was readily available to EPA. What it wasn't sure of was the concentration. That's why I make the point that the SSDS shrank that range of concentrations. And even if you take the highest such concentration of the hazardous substances that were at issue, that's what adds up to .006 pounds. That's the difference between the SSDS being taken into account and EPA dropping all the way down to tier D and calculating it based on the footprint of this big building. If the court has questions about the resident versus worker benchmark, I'm happy to answer them as well. If I could just make one or two quick points on that. The point of the resident versus worker benchmark is the technical support documents accompanying this rule, the rule itself, talk about this issue in terms of what is the reasonable maximum exposure that someone is likely to be exposed to at a site. And where you have a site that is zoned exclusively for industrial use, your reasonable maximum exposure is going to be the concentration assignable to worker indoor air. And this is not just me saying this, by the way. I don't think this was in EPA's brief, unfortunately. But if you go onto EPA's website and you look at what we talk about, what both of us talk about as regional screening levels, one of the things that you will find is actually a link to a vapor intrusion screening level calculator. And the vapor intrusion screening level calculator asks you, is this site a residence or is it not? And if you plug that in and you say this site is industrial, what you get are our numbers. So the vapor intrusion calculator on EPA's own website makes our point for us. But this, again, if you hold all the other two things constant, if you give us the 10,000 pounds of waste and the observed exposure and you conclude that EPA should have used the worker benchmarks, we prevail as well. Now they say it comes out the same because of that division by three. What do you say back to that? I say that the division by three actually was something that the technical support document acknowledged. And what the technical support document, and this is something that both we and EPA cite, at page 62 says, the divide by three is consistent with how EPA determines the appropriate regional screening levels. So the divide by three point doesn't, as we say in our brief at page 41, it doesn't cure the problem. Because the reason that those benchmarks are different... There's a problem either way, right? If you adopt the rule that you want, you're double dividing, right? You start with the worker benchmark, which has baked into it eight hours per day of exposure. And so you get the most reasonable answer with regard to line eight, exposed individual. But then when you come to line nine on population, you divide by three for full-time worker, divide by six for part-time worker. That's obviously designed to account for the fact that people are only at the site for part of the time. So you're double discounting. On your view, you're double discounting on nine. On their view, you're overestimating on eight. I think it's difficult to talk about double discounting given the complexity of the algorithms we're talking about. But one of the things that the technical support document that I just quoted makes clear is, EPA itself understood that these two things, the divide by three and the slightly lower concentrations for workers were designed to go together. Divide by three is consistent with the slightly lower concentrations. So my point with divide by three is it goes to a different scoring altogether. The reason that the concentrations are set where they are is to distinguish between those two very important level one versus level two categories. And once you drop down to level two, you're scored in a completely different way. If you are instead, as EPA found here, in level one. But the question is, do you have, is there any level one concentration? Right. Is there a one in a million risk of getting cancer? Yes. So if, and that is relevant to item eight. And it's also relevant to the level one, what's called population level one, line 9A. Right? It is, I'm only resisting this because I think those two considerations, the lower worker benchmark and the divide by three are relevant in different ways. Eight conceptually is, is there anyone who is going to be exposed? Right? And nine conceptually is, what's the extent of the exposure? Yes. But the point that I made with respect to EPA's own vapor intrusion screening calculator is what they call it, which literally does permit you to plug in factors and get a result. That calculator, and I'll quote from this, asks you whether you are in a residential or non-residential exposure scenario. It uses the same database of toxicity values, et cetera, as the regional screening levels for Superfund sites. So the EPA's own calculator instructs that you use those lower benchmarks. And if you plug those benchmarks in, just as you've done, Judge Hapsis, what you would also do is use a divide by three by workers. But I think those are for two different purposes. How does your system, how does your approach get 9A right? If you start with the number designed to measure the one in a million risk at eight hours per day of exposure, and then you calculate the level one concentration by further dividing by three. Right. I think the short answer is, as you pointed out, neither of us gets this reliably, accurately right. The question is what does the table have sort of more tolerance for? And my point is EPA has said in its technical support document, says in its vapor intrusion rule, that you use the lower worker benchmarks. Now what EPA says, in addition to the double discounting argument, which I think just goes to a different point because those two are designed to cover different things, but what EPA says is you don't look at the worker benchmarks because this potentially could get turned into a residential site. And that's plainly not the case. The other reason that the divide by three often comes into play is if you look at the appendix, I believe it's D, to the proposed rule that EPA cites a couple times, what you'll see is 11 different tests of sites across the country under this new proposed rule. Every single one of those 11 sites is either residential or mixed. They don't do a test of just an industrial site. And when you have a mixed site, we concede, and we conceded in our brief, that you use that highest reasonable exposure that the site's designed to give someone exposure to, so a resident. But where you only have a worker and where EPA tells you to look at a worker site and then EPA tells you to plug that benchmark that it gives you under its vapor intrusion calculator into the equation, that equation is designed to come out with a value that EPA has decided adequately. I understand, but that sounds to me like an argument that on their rule, the determination of exposed individual under eight is most arbitrary in a case like this one where you only have workers and no residents. And I think that's probably right, but your rule, no matter who the people are, workers or residents, well, your rule, if there are workers, seems arbitrary in the calculation of 9A because of this double division point. No, I think our rule is if there are only workers, to be clear. If this is a mixed-use site, if there are workers and residents within the site, you use the highest reasonable exposure, and that is the residential exposure. So our rule is if there are only workers, what you should do is what EPA has told you to do in its regional screening level, has told you to do in its vapor intrusion rhythm calculator, and you take the worker screening levels. Now, when you plug that in, yes, you do divide the workers by three. We submit that that is for a different reason. What is the different reason? That's what I was about to say. I don't think any of us in the courtroom understand how EPA arrived at the ways to weight the various values of this. Which is why I asked you at the outset, are you challenging this reg as applied? I mean, just looking at it, I can't make heads or tails of it. It seems totally arbitrary, but if we're stuck with it. I think we are largely stuck with it, but I think what the court should look to are the two other sort of external EPA-directed points that I mentioned. Well, let me give you two reasons. If you just accept my framing that you have to choose either between a Line 8 error and a Line 9A error, one argument for EPA's position is it's just an initial cut and we can take the most protective approach possible, so we're just going to pretend that everyone is there 24 hours a day. Another one, which may be one I'm making up, but another one is if you just try to assess the magnitude of these things, Item 8, which is just, is there any individual there, is worth only 50 points. Item 9A, which is like how many people are there, is worth 650 points, which seems to be more important to have a precise calculation of 9A rather than a precise calculation of 8. So, let me take the first of those two. You made the point that EPA could conceivably have designed this to be the most protective. In fact, that's one of the things that EPA says in its brief is in the proposed rule, and I think they refer to a response to a comment at page 44 of Appendix E to the proposed rule, and they make a point in that response to a comment that this is designed to be the maximum exposure no matter what the land use. That's not what the final rule said. What the final rule says is not we're looking at this as most protective. What the final rule says is this is designed to accommodate the reasonable maximum exposure that someone is to be subjected to at a site. Now, it is conceivable to me, even though it may look like gibberish on the page, that EPA decided to weight the values and weight the targets and weight the populations differently for a fully industrial site than it would for a mixed site or for a residential site. But the core point of the residents versus workers calculus is the residents versus workers calculus EPA tells you itself is based on two different benchmarks. Those benchmarks should have been used and should have been plugged in. But again, each of these arguments that we've talked about, the observed exposure, the weight characteristics, the target population, workers versus residents, each of those, if you agree with us, that EPA should have taken the subslab system into account, each of those fails independently. So you only need to find for one of us, for one of those, for us to prevail here. Can you just help me with where you raised below that they should apply the industrial benchmark? Yes. We preserved it as Joint Appendix 71 to 72. And what we argued there was you used the wrong benchmarks. Here are the ones that you should have raised. Now, Judge Millett, you may say, but you didn't use the word industrial. The point is, the question about how sufficiently you raised something often depends on whether EPA understood what you were raising. And EPA clearly understood what we were raising. If you look at Joint Appendix 648 and 652 to 653, EPA knew exactly what we were talking about. It said we're not going to apply the worker benchmark. We are going to apply the residential benchmark. We're going to apply it because it's most protective. And we're going to apply it because it's just easier that way because then we can just look at this all across the piece and we don't need to look at whether a particular site is industrial or not. That's not the way these regulations work. It's not the way EPA has told the public and regulated entities that these regulations work. And I think we adequately preserved it given the fullfulness of EPA's response. Sorry. I'm just trying to get 47, 648. It's kind of like you're saying there were prior numbers that they used and they should have kept using those. You wanted to use older numbers. Is that the same thing as industrial? The screening concentrations that we are referring to are the industrial screening concentrations. And my point is when EPA responded- Is that the 8.8? Yes. So 8.8 is the concentration for- And they found a 26th delay even after the system was in place? They did indeed. What EPA didn't tell you but what EPA well knows is that that was because of a broken line at a particular time that was immediately reported to the agency and fixed. So the fact that EPA's 6.8 is on that one number I think is telling- Even with the system in place, it still produced a 26 at one point in time because they aren't perfect. I don't think that even the EPA expects a vapor mitigation system to be perfect. This vapor mitigation system is, as EPA has said in its own documents, state of the art. And the reason why you have several amici coming in and talking about the importance of this issue is because this system is used in hundreds or thousands of sites across the country. So the fact that it had a broken line on one day, for EPA to say that indicates that the long-term exposure of a worker in that site is 26 is simply not true. If there are any further questions.  Thank you. Thank you. May it please the court. John Thomas Doe with the Justice Department on behalf of the Federal Respondent EPA. I'd also like to introduce individuals from EPA at counsel's table. That would be Eric Swenson and also Theresa Mann. I'd like to begin with perhaps if the court has any questions with regards to standing. Given the court's recent order, I can certainly represent that EPA did not contest standing in this case. However, if there are any factual questions with regards to- Is EPA's position that they are a responsible party? It is true that factually EPA has identified Meritor as a PRP. They did so in past administrative orders on consent. And they've also sent them a letter identifying them as a potential PRP. Now, PRP, of course, would be a later determination in the event that EPA- Is that identified by EPA repeatedly as a potential- That is correct. Responsible, a potential responsible party. I would highlight nonetheless, though, that may not necessarily be the dispositive question whether or not someone has standing. Certainly, CTS spoke to that in part, but it is, of course, a factual case-by-case analysis. And I would highlight with regards to the reputational standing, the reputational injury that Meritor spoke to, that Meritor has been connected to the site for a number of years. At least they've been working on it since 2001. And so certainly any reputational damage that's been done, it's already been done and not connected to any potential NPL listing. Unless there are any further questions on standing, I'd like to move on to the merits and hopefully perhaps synthesize these regulatory provisions for you all. Can you start by talking about 5.2.0? Of course, yes. Does that require litigation systems to be considered throughout? 5.2.0 is the general consideration provision of the subsurface intrusion regulations. It merely identifies that certainly when you're going to score a site, you should score a building that has a structure of attainment value more than zero, which Meritor, of course, cannot contest. I would highlight specifically in 5.2.0 that it speaks to examining hazardous substances that have or could intrude, meaning both in the past tense and also potentially. And that theme of examining what has previously happened is throughout the entire regulation itself. I would point to, if I could just summarize, if you will indulge me while I summarize those provisions. Under observed exposure, that would be 5.2.1.1.1, it states EPA should examine whether or not a hazardous substance has been released. Well, they say it's stale once they have a system in place. Well, as your Honor pointed out, that was the best information that EPA had at the time. That was relatively recent. It was from the prior year and certainly from the point of investigation to actually promulgating a rule and listing them, EPA used the best information that they had. And it certainly is not stale. EPA knew that the system was in place by the time they proposed it, right? That is correct. EPA did know that it was in place and is aware of the nature of the system. And at the same time, when they ultimately went final with the rule, they discussed the possible impact that the SSDS system had and concluded that it had no impact on the observed exposure component specifically. In fact, all the subsequent data supports EPA's prior position, prior findings, that there have been observed exposures. And if I could just go back to, again, that meritorious conceded as the briefs are presented, this is a challenge to EPA's application of the regulations. It's not the statute. And I would nonetheless note that the statute, of course, concerns known and threatened releases. Again, all past tense language that EPA doesn't merely examine what's happening today at the site but certainly needs to score what has previously happened as well. So diving into the regulation, first major point of contention is observed exposure under 5.2.1.1.1. And you say has been released. The tense of that seems helpful to your position. And direct observation has the formulation has been observed, which reinforces that. But then if you read down to chemical analysis, which is what was done here, you see the present tense. The observed concentration is significantly above the background concentration, present tense. Present tense in the sense that when you do the comparison and to this day, the two samples are, continue to this day, to show an observed exposure. When you compare it, it shows observed exposure. This is not faulty information or bad information. It remains true today. It is observed exposure because the comparison is three times background levels. And I'd also highlight Section 2.3, which applies to all pathways and speaks specifically to likelihood of release or exposure, observed exposures. It is examining ways that- So you mean 5.2.3? No, Your Honor. 2.3. So Section 5 deals specifically with the subsurface intrusion regulations, while Section 2 applies to all of the pathways. And Section 2.3 specifically provides that EPA, again, examine ways that has been and will be released. And you also had exposures after the system was- or an exposure after the system was in place? That's correct, Your Honor. I believe there are upwards of 30 examples of observed- of values that indicate observed exposures following the operation of the SSDS. 30? 30 observed exposures? Yes, I can give you the more specific number. It would be 28 samples, Your Honor. Downward of 30. And where is that in the definition? I would point to JA584 to 586. That shows a table, Table 1. Ten of those 14 values are shaded, indicating an observed exposure. I would also go to JA667 to 68. That shows 18 of 18 samples in bold, also indicating an observed exposure. And the system was up and running in January 2017? I'm trying to remember. December 2017? I forget. I had to get the date to let them turn it back on. Sure, it- there's a pilot program in mid-August to mid-September 2017, and then began operating again in late December 2017. So the shaded operations are during the pilot time? That is correct, Your Honor. Okay. Looking at the structure of the regulation? The structure of containment value or the structure of the- Sorry, the overall. I'm on the chart. Sure. So the current regulations, as I understand it, are explicit in requiring consideration of the remedial measure with regard to structure containment, which is potential for exposure, Line 2A, and targets, which is State 8 through 11. So why- and just assume for now that I think the regulation is silent on this question with regard to Item 1, observed exposure. Why would a regulator want the subsequent measure considered for purposes of potential for exposure and targets, but ignored for purposes of observed exposure? It just seems like an odd structure. Sure. Well, it actually isn't completely ignored for the purposes of observed exposure. If there is a structure containment of zero, then that would not necessarily be scored. Otherwise ignored, unless perfectly effective. And to be clear, in no instance has the meritor alleged that they deserve or would get a zero under the structure of the standard value. And if I may- But why would you fully take it into account in determining potential for exposure and targets, but not take it into account for purposes of determining observed exposure? Well, I would also note, it is taking into account observed exposure. Observed exposure is mentioned in that structure containment table, table 512. If there is a- If the value is other than zero, it would be considered for those two purposes, but not for that. Correct. And of course- Why would that be? I'm sorry, Judge Shintok. I think I misunderstood your question. You just get the split two. You're taking it into account, even if it's not zero, for the other two purposes, but not for that one. Why is there a difference? Well, I think that is the nature of the way that EPA designed the regulation. That changes the question, too. Why is that the nature of the regulation? I think it's quite common for certain components to be considered for scoring purposes in one area and not another. I can't speak to specifically that. If you're trying to find the risk of exposure and you've got certainty, it's actually happened. Correct. And the other thing is measuring risk, and this is certainty. Well, the certainty would be a zero, Your Honor, in terms of- In fact, there's actual exposures. I just counted for more for the system. That's correct, and we do not. So, given that- EPA has the discretion to consider it and not. This Court has recognized that in the Winemaster case and the Equal Picture cases, which you, of course, recognize predate the current iteration of the HRS, but nonetheless, that HRS was silent on whether to consider removal actions. What about the general APA principle that agencies should consider more recent data rather than less recent data and should take account of relevant factors rather than none? Sure, and this Court has recognized, and I would cite Equal Picture and also Sidious-Toten, that past information is relevant. And, in fact, Sidious-Toten specifically noted that merely the fact there's a downward trend or that subsequent information- I mean, if you were just thinking in the abstract, and the situation on the ground now is that there's a system in place and it works really well and it's making a difference, and you have data from today that takes that into account, and you have data from a year ago before the system was up and running that doesn't, why would you pick the older data that doesn't account for what's actually happening at the time you're making the determination? Sure, I would certainly understand wanting to use the most recent data, and they certainly wouldn't contest that, and I would also. So, let me argue in this instance, we did examine the most recent data. But I think it's also important to contextualize that data. That data comes from a response action that does not address the underlying threat that's at issue here. The SSCS system treats a symptom. It treats a cost. It doesn't treat the underlying infection or disease that's causing these vapors to continue to intrude into the building. It doesn't remove it substantively or in any meaningful way. And if EPA were to consider crediting such a system, it would artificially shield it from remediation. And I would highlight that when EPA was promulgating this new subsurface intrusion regulation, they specifically cited the fact that these SSCS systems are not perfect and prevent EPA from, and the prior iteration of the HRS prevented EPA from scoring these sites despite the very real threat that they have, both for the workers and the potential for it to migrate into other communities as well. Thank you. Something about, because your proposed rule came out in 2018, the proposed listing in 2018, right? Am I right? The proposed site listing or proposed subsurface intrusion regulation? No, no. I mean, sorry. I mean the proposed listing. I apologize. The proposed listing was 2018? The proposed listing itself was in January 2018. That's correct. Right. January 2018. And you had data at least through September of 2017. At the time of the proposed rulemaking, we were, EPA was aware that there was an SSCS system in place. They did not necessarily have the actual data. Show me the chart that shows September 2017 actual exposures. That came, the information about the SSCS system came following proposal through the NOAA subcommit process. You hadn't gotten, okay. All right. My assumption is you kind of have to fish your cut bait at some point on collecting your data. That's correct. And so for the proposed listings, you cut it off before the system was in place. And then once you're getting comments on a proposed listing, what is the general time frame that you look at before making a find? Because someone could always be submitting new data, at least in some other EPA areas. We have said years back is okay because you have to just have a cutoff date. But for a listing like this, which is a targeted decision about a particular site, how far do you usually, how much more updating do you do between proposed listing and final determination? Sure, you're right. Of course, there must be some slides that EPA needs to cut and fish bait, I should say. And in this case, the comments were received prior to the notice and comment cutoff date. And therefore, EPA did do the good government process of examining that information. I would note, actually, that under the 1990 guidance for when to consider response actions, EPA would only do so if it existed prior to proposal. That isn't the case here. Again, EPA did take the additional step of reviewing all the data that was received. So I would say if there was a date, it would be certain a date at which point EPA did the cutoff for providing comments. But they did say that their concern is that, yeah, you took it, but you didn't give it material weight. You were still relying so much on measurements that were made beforehand. Well, EPA took that information, and after appreciating the nature of the SSDS and examining EPA's past policy about how to examine response actions, that's the 1990 policy, EPA decided that it could not use its discretion here to ignore the regulatory command as to examining past samples and past exposures and elected not to do so. Nonetheless, EPA took the exercise of even if it could, even if they could ignore the pre-SSDS samples and only look at the post-SSDS samples, it would nonetheless reach the exact same conclusion. Suppose there were no samples taken before SSDS was up and running. And you learn about the site. You have concern. You go in, and the one and only sample you take is after the system is up and running. And it shows, you measure whatever it is. What's the concentration of the gas in the facility with the system running? And it comes back very low. What would you do then? Under that hypothetical, Your Honor, I think EPA would nonetheless primarily rely upon the past observances. That wouldn't make any difference because your position is you don't take things like SSDS into account. Well, in the exercise of EPA's discretion in terms of when to consider response actions, that would certainly be a very fact-specific situation. Assuming it's an SSDS system and you're hypothetical, I find it, I believe it would be unlikely due to the exact nature of the SSDS, which is not to substantively address the underlying contamination. And is it your position that the regulation prohibits you from taking something like SSDS into account in calculating observed exposure, or that it's silent and you just do that as a matter of discretion? The regulations do provide specific instructions, some of which I've gone through. For observed exposures, I've addressed how its past samples are taken into account. I would also note HRS Section 5.2.1.1.1, which deals specifically with observed exposures, which again concerns past samples. With regards to targets, I would cite to HRS Section 5.2.1.3.1, which states that any sample should be considered. And so therefore, under those regulations, they are confining EPA's discretion. There may be some wiggle room in the event, for example, that a company were to, for example, remove the actual vapor-causing chemicals in the subsurface. Perhaps in that situation, EPA may consider not crediting the past samples, given the fact that there is no longer a threat, or that threat has been substantially reduced due to the permanent elimination of- If you actually remove them, then you've accomplished the purpose of the act, correct? I'm sorry? If you actually remove the vapor-causing, then you've accomplished the purpose of the listing, haven't you? Well, it is possible you wouldn't be listed at all, certainly. However, I would note that the one area in which I did not provide a regulatory provision for, which was the hazardous waste quantity component of it, under that component, it is possible, with sufficient evidence, that if there has been a partial removal, that EPA could credit it in that situation. But if there's a total removal, why would there be any point in EPA continuing to do anything? Well, if there's a total removal, you're right. That particular building, for example, would not be scored. Can I just clarify, are we talking about total removal of the vapors, the coffee? No, we're talking about total removal of the subsurface. Are you talking about the subsurface stuff? I am talking about the subsurface, yes, Your Honor. Thank you. Yes, Your Honor. But in terms of where EPA would score it, it is possible that EPA is scoring multiple buildings, so perhaps one particular building that has had its subsurface contamination removed, either completely or partially, that would impact the score of that particular building. Why would it have a score if all of it's been removed completely? That particular building may not have a score, but the site, the site which may be larger, would. If it's removed from the site, then the site would not be removed. That is correct. I don't understand your quibble on this one. I don't care about your quibble. I make that note in reference particularly with hazardous waste quantity, which can use under Tier A and possibly Tier B, but primarily Tier A, on the site data to score partial removals. We didn't have that information here, and the EPA instead scored under Tier D, which is, of course, based on the footprint of the building, which can't be impacted by any type of removal system. Unless there are further questions with regards to the use of SSPS, I can move on to discussion about the benchmarks. Actually, forgive me. Yes. No, go ahead. Actually, I did want to address one more thing with regards to the tier issues that were raised in the prior questioning, Your Honors, and that is whether or not Meritor preserved its Tier A arguments. It's our position they have not. As Judge Moulet, you asked earlier with regards to their citations, that particular citation does not inform EPA that they have a particular concern with regards to Tier A. The SSPS does not provide any information that was necessary to do a Tier A calculation and certainly does not put the agency on notice. Instead, what the agency did receive from comments, which is cited at JA643, was a complaint about how EPA calculated Tier D. The allegation was that EPA used the wrong footprint to calculate it. Now, certainly, complaining about a different problem doesn't put the agency on notice of a supposed Tier A problem. So, therefore, the agency did not have notice of it and it's waived. I would cite the Texas 10 case with regards to that proposition. With regards to the benchmarks questions, Your Honor, first there is an issue of timeliness, and I think this leads to the difference of perhaps framing of this case. Meritor believes, essentially, that EPA set out a standard previously and has not followed it today. It's EPA's position that when EPA was promulgating the subsurface intrusion regulations, it decided it was going to use a maximum exposure assumption. And they can argue that the reg was misapplied here in this listing decision. I think it's our position that we, EPA use, decided back in 2016 that they were going to use the maximum exposure assumption, which is residential. Meritor's argument today, therefore, speaks specifically to that question. It is within an instance where... They're saying that the proper measure under this regulation in these circumstances is the workplace measure, not the residential measure. And we can debate that on the merits, but that's an argument about how to apply the regulation to this decision. I think, Your Honor, the question is whether or not EPA's reading of the regulation, which is to require, excuse me, which is silence on exposure, and EPA has read that, to allow it to use a residential-based exposure assumption regardless of land use. Now, Meritor... You read it in this case that way? No, Your Honor, that's the distinction I'm trying to make. Where is that reading first articulated? It's first articulated in the proposed rule, and then again in the final rule. In both the proposed and the final rule, a commenter specifically requested that EPA consider screening levels for industrial situations. And EPA rejected that comment and instead noted that it would be either in the worst-case scenario to use the language of the proposed rule or the reasonable maximal exposure to use the language of the final rule. And in both instances, EPA again rejected it, noted that worker exposure time could be accounted for in the division by three later on. And by receiving comments, considering alternatives, EPA bound itself to the use of a residential exposure assumption. So your point is no choice was made here, that the rule itself across the board requires the use of the residential benchmark, and then you divide by three. That's where that comes in. Yes, when you say the regulation, the regulation that's codified in CFR does not express one way or another whether to divide the population based on particular characteristics. But EPA stated in the preamble and in response to comments in the technical support documents that it would use a residential exposure assumption, which is the same across the board. Uniformly. Correct. Which is how exposure assumptions are used across the board in all pathways because it is the most protective and allows EPA to efficiently screen for a wide variety of sites. Are people supposed to bring challenges to interpretations and regulations at the time of the final rule? It's not in the rule itself? I thought they could wait until that interpretation was applied to them and then raise the challenge. I would note two things. One is that it depends on the face and context of whether or not the communication bound the agency itself and regulated parties and its opposition that it did. And I would highlight that CERCLA's judicial review provision, this court has repeatedly recognized is special in the sense that it provides or it prefers pre-enforcement review. They're not seeking judicial review of the regulation. They're seeking judicial review of this listing decision. I appreciate... So you applied your interpretation to them? It is correct in the sense that in this case EPA did not go and examine the facts and ask what is the reasonable exposure assumption and decide that it was a residential exposure assumption. So you didn't have notice and comment on that particular decision? Well, there was notice... Well, there's notice and comment of the listing decision itself. There's also notice and comment... I'm sorry, I'm trying to get back to your rule. Yes, well, there was notice and comment of the final rule, of course, in which EPA expressed its intention to only use a residential exposure assumption in the proposed rule and did not change course in the final rule. And in the final rule, you said it's in the preamble? In the final rule, it is in the preamble, and I'll give you the exact... Is that enough? I'm sorry? Is that enough? Well, under the American Petroleum and Kennecott case, those cases left open the ability to challenge a... not a regulation in the CFR, but preamble language specifically. They specifically cite preamble language as a possibility for... I'm wondering whether you can, but do you have to, or why isn't it perfectly sensible to wait until the rubber meets the road and they actually apply it to... My bet is that people come rushing in, they go, that's just the preamble, and wait until... it's just an interpretation, and you have to wait until it's actually applied to you. I can certainly appreciate that, which is why I go back to, specifically, the judicial review provision in CERCLA, which this court, as recent as the U.S. amnesia case, calls for, is exceptionally limited in the sense that it encourages, specifically, pre-enforcement review. Otherwise... Which says if you want to challenge the promulgation of the regulation, you do so within, however long, 60 days of the promulgation? It's whether, if you could have done it back with the original promulgation, you should do it, and you should not wait. That is the case law with regards to CERCLA's judicial review provision, particularly with regards to the NPL, which is a program that Congress has intended EPA to execute as expeditiously as possible. So rather than waiting for challenges to later come on an as-applied basis, there's a strong preference for... If it's entirely within your control, you actually codify in CFR your interpretation, and you won't have this issue. That is true that the agency could have done that. But certainly the fact that contemporaneous, I would lend itself as further evidence of the agency's interpretation of why it's authoritative. Assuming it's not an untimely challenge, did they preserve in their comments here the claim for the benchmark you agreed when they invoked, like, 8.8? Is that the number? That is correct, Your Honor. And you understood that to be an argument for the industrial benchmark? No, the agency did not, Your Honor. It opaquely references the 3.0 and 8.8 number, and specifically stated that EPA should use these because they have previously approved them, but without any other specificity. But those numbers haven't established... It wasn't like they were just grabbing numbers out of the air. Did those numbers have an established meaning? They do. They were used in the removal context, or, for example, the time-critical removal context. The SSDS, for example, cites those specific numbers, and that's the basis of EPA... excuse me, that's the basis of Meritor's inclusion on it there. Now, Meritor previously referenced some calculator online. I will have to concede, Your Honor, that's the first time I'm hearing of it, and that's certainly outside of the record, and I can't speak to that. But with regards to the waiver issue, again, the agency took Meritor's comment to be, you should use this number because you used it previously. And in response to that, EPA did explain in the support document why it uses the numbers that it did. And at that point, we can see we did note that there are differences between the values, that our value is a residential exposure number, and that at least one of their values is more akin to a worker-based number. And that is where that discussion comes out. But, again, we also noted in the support document that the exposure assumption we use is the residential exposure assumption because that is the reasonable maximum exposure assumption that EPA uses. So the regulation says you use an appropriate benchmark. And you didn't necessarily have to develop separate measures for 24 hours per day, which corresponds to residents, and eight hours per day, which corresponds to workers, but you did. We have both numbers, and we have a site that's exclusively a workplace. Why isn't this just very simple? The appropriate benchmark for a workplace is the one-in-a-million measure that's keyed to workers. So we don't contest, Your Honor, that it is technically feasible for EPA to have come up with a more tailored number for... I'm sorry? You did that. A more tailored number? You have separate numbers for the 24-hour-per-day exposure and the eight-hour-per-day exposure. We do not, Your Honor. I cannot say that the numbers that Mayor Torres cites is the exact same as the calculation that we did here, but for the exposure assumption. You would have to go and create that number. I don't know what that number is. It is technically feasible for EPA to do that, but the reason why... I mean, I don't have chapter and verse memorized, but my recollection is everyone agrees there is one set of numbers. There's one set of numbers for the 24 hours per day, 50 weeks per year, I forget, 25 or 27 years, and there's a separate number for the eight hours per day. I agree that there's a separate number in theory. My point is I cannot say with certainty that the number that Mayor Torres presented is that number. It has been adopted by the agency as the measure of the one in a million risk for someone who is exposed eight hours per day rather than 24 hours a year. You're saying you don't have those numbers. We'd have to create those numbers, which I concede is something EPA can do. They have the ability to do so, but EPA gets these benchmarks from a matrix. The matrix currently does not have that value. Now, again, I recognize it may be close or it may be that number, but EPA has not done that because they apply, again, the same exposure assumption in all cases for the SSI currently. You said the 8.8 came from removal? That's correct. And this is not removal? Time-sensitive removals like the SSDS system. And I can say with confidence that the 8.8 number is primarily targeted towards immediate, more acute exposure as opposed to long-term exposure, which is what the Table 520 benchmarks are aimed at. So 8.8 does not get long-term exposure. That is correct. And Mayor Torr also, I believe, would recognize that they aren't relying on the 8.8 number. They're really relying on the 3.0 number because they need to use the lowest of them all. And that's also not long-term exposure? Is that a 3.0? My understanding is the 3.0 number may have some protectiveness with regards to long-term exposure, but, again, I can't speak to the specifics of that. And EPA itself, again, has not calculated that number for the purposes of a benchmark to use in this context. Sorry, is it wrong to say that EPA has calculated the risk created in a worker exposed for 8 hours per day, 250 days per year, 25 years for TCE to be 3 micrograms per cubic meter? I believe if you're reading what that definition of it is, then yes, that is that number. My point is I can't speak with certainty if all the variables that went into EPA's number of .4 is exactly the exact same variables as the 3.0 number, but for the exposure assumption. There are a lot of other variables that go into that, and I can't speak to that. So, therefore, I'm not saying whether or not they're the same, but for that. But my greater point, of course, is that looking at the regulation, there is no requirement that EPA break down these target populations in the manner in which Meritor suggests. I would highlight the case, City of Stoughton, in which a city proposed to the agency that we have this alternative population. It is more accurate by splitting the population based on where they get their water. The court in that case decided that the HRS does not require you to divide the population in such a manner, and we will not do so because EPA needs to use specifically generally applicable regulations that they can apply across the board, and that in this case, EPA applied one that is more protective, which this court has recognized in Board of Regents. EPA can err on the side of over-inclusion, and that is routine for EPA to use simplified assumptions and formulas rather than actual on-site information, even if it's available, for the purposes of creating a screening list that recognizes the most relative needy sites in need of further cleanup or investigation. So the system applies, would apply, nothing would change then in this respect, in this respect if in fact there is like a neighborhood nearby that you said you didn't factor in, but if you did, it would still be the same sort of uniform measure. We would. If by happenstance one of the first, the first case that EPA scored for the SSI, subsurface intrusion component, was a site that only included workers, but of course there will be many other sites that have a variety of individuals. EPA would not score only pregnant women if it was looking at a maternity ward. It wouldn't score only children if it were looking at a school. They could. EPA can technically come up with numbers for exposure assumptions or for the exact risk that these particular subset of individuals have, but because there must be some line that EPA must draw so it can expeditiously implement this program, it applies the same exposure assumption across the board. And that is true for all the pathways, which is critical because this is supposed to be a relative list. And it would skew the numbers if EPA were, for each site, to determine more specific information with regards to exposure assumptions for individuals. All right. Thank you very much. Thank you. Thank you, Rajesh. Just a couple quick points, and I want to frame this in terms of regulatory commands because Mr. Doe made a point at one point about how EPA was simply acting under a regulatory command not to consider response actions. But as Mr. Doe knows, that regulatory command was eliminated in 1990. This court in Linemaster Switch in 1991 expressly made the point that that prior policy was no longer EPA's policy. What is a command is EPA's rule that preliminary HRS scores are refined as sites progress through the process. What is a regulatory command is that you can't make a determination based on old data when you have data available to you. And I want to be very clear on this. The reason that EPA did not use the SSDS wasn't because Meritor was leaked. It wasn't because it didn't have the data.  They ignored it because the SSDS, this complicated system underneath the building, was temporary and didn't remove all the waste. Neither of those things is supported either by the record or by the regulations themselves. What is a regulatory command is that EPA take into account response action when it is deciding hazardous waste quantity. Now, what you heard was Mr. Doe saying we weren't clear because one expert only looked at the footprint pertaining to tier D. It was very clear from EPA's own comment response that EPA understood that we were arguing that you should take the SSDS into account when calculating waste quantity. And finally, it is a regulatory command, as you pointed out, Judge Katsas, to use an appropriate benchmark when you're calculating exposures. That's a pretty open-ended command. It is open-ended. And the point that Mr. Doe made about comparing to the other pathways, we respond to this in the reply brief, and I'd encourage you to look at it. The other pathways all have specifically set measurements that pertain no matter what the length of exposure or what the length of time or who it is. This exposure is different. This appropriate benchmark changes depending on whether you are a worker or a resident. And Mr. Doe should have been aware of the calculator because a joint appendix 653, which is the page that contains a very detailed recitation of all of the numbers that Mr. Doe said EPA didn't know, among other things, contains a reference to the EPA vapor screening calculator. Joint appendix 653 gives exact numbers for everything that we are talking about. Did you argue about the calculator in your brief? We did not argue about the calculator in the brief, but we certainly did argue about these numbers that are drawn from the calculator. My point about the calculator... You didn't mention the calculator per se, did you? We didn't what? You didn't mention the calculator per se. I didn't mention the calculator per se, no. But my point is the calculator that is the point of reference for the EPA directs EPA to do what we say it should have done, which was to calculate this based on workers. This was only a worker-occupied site. The answer, of course, is different if this is a resident site or a mixed site. But here, where you have only workers, the regulatory command is that you use the appropriate benchmark, and the appropriate benchmarks are the ones that we articulated and that EPA well understands. Thank you.
judges: Millett, Katsas, Sentelle